UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **ESTATE OF WILLIAM D. PILGRIM,** *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>**GENERAL MOTORS LLC,**<br><br>Defendant. | 2:20-CV-10562-TGB-DRG<br><br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**(ECF NO. 38)** |

Plaintiffs are purchasers of Corvettes and other vehicles equipped with an LS7 7.0L V8 engine from model years 2006 to 2013. They allege that GM equipped these vehicles with the LS7 engine despite knowing that the engine was defectively designed and manufactured and prone to catastrophic failures. Having survived a motion to dismiss and completed their initial phase of discovery, they seek certification of twenty state-specific classes and one nationwide class on a variety of legal theories. ECF No. 38. Many of these theories involve state-specific consumer-protection laws and common-law fraud claims.

The Court held a hearing on this motion on June 28, 2023. Having carefully reviewed the arguments advanced in the briefs and considered the relevant law, the Court concludes that Plaintiffs have not carried their burden to satisfy the requirements of Federal Rule of Civil Procedure 23. The sprawling mass of claims and the variances in the

substantive law governing them make this case unsuitable for class treatment. For the reasons explained below, the motion will be **DENIED**.

## I.     BACKGROUND

### A. Factual Allegations

The Court refers to its previous explanation of the defect alleged in this case. *Estate of Pilgrim v. Gen. Motors LLC*, 596 F. Supp. 3d 808 (E.D. Mich. 2022).

Briefly, Plaintiffs all bought one of two different Corvette models— 427, model year 2013, or Z06, model years 2006-2013, with an LS7 engine. ECF No. 15-1, ¶ 1. They say that defects in the "design, manufacture, and assembly" of the LS7 engine makes the engine susceptible to frequent mechanical failure due to "valve guide wear." ¶¶ 4, 8. This sort of wear can lead to dangerous conditions, including oil leaking under the vehicle, interference with the brakes and power-steering, and explosion of engine parts which—in some cases—can lead to the vehicle becoming engulfed in flames. ¶ 5. Even if an individual does not suffer a catastrophic failure, he or she can incur heavy repair costs to get valve guides back into spec. ¶¶ 5, 7, 25.

According to Plaintiffs, GM has known about the defect since the engine was first developed, and its own engineers have posted about it on public forums. ¶¶ 8-9, 13-15. But instead of disclosing the defect, GM actively concealed it and characterized any issues consumers experienced

as manufacturing defects limited to a supplier error occurring during a short period of time between July 2008 to March 2009. ¶ 12.

At some point during the life of the LS7 engines, GM developed a "valve wiggle test" for dealerships and technicians to use to determine whether the valve guides in LS7 engines were out of spec. ¶¶ 20-21. Plaintiffs say that use of this test led to more investigations and repairs than GM wanted to perform, so GM summarily and unreasonably stopped using it. ¶ 22. It did not issue a recall for the engines. ¶ 8. Instead, in an effort to "tamp down the furor" of public opinion regarding these vehicles, GM engaged a third-party author, Hib Halverson, to review the engine and publicly state that the defect was "rare" and confined only to certain model years. ¶¶ 15-17.

**B. Procedural History**

The claims in this case have their beginnings in a lawsuit that was filed in 2015 in the Central District of California. *Pilgrim v. Gen. Motors Co.*, No. 15-08047 (C.D. Cal. Oct. 14, 2015). The initial complaint included eighteen plaintiffs who purchased vehicles manufactured between 2006 and 2009 and wished to represent classes of purchasers and lessees of model year 2006 to 2013 vehicles. The complaint was amended twice, once in 2015 and then in 2019, to include additional claims and Plaintiffs. On GM's motion, the claims of all non-California plaintiffs were dismissed for lack of personal jurisdiction. *Pilgrim v. Gen. Motors Co.*,

3

408 F. Supp. 3d 1160, 1169 (C.D. Cal. 2019).[1] The plaintiffs whose claims were dismissed re-filed in this district and, later, added additional individuals to the action.

The operative complaint in this case spans 309 pages and originally raised sixty-three separate causes of action on behalf of forty-four Named Plaintiffs. ECF No. 15-1. Broadly speaking, Plaintiffs' claims fall into three "buckets:"

1) warranty claims;
2) claims for violations of state-specific consumer protection statutes; and
3) claims of common-law fraudulent concealment.

As discussed in the Court's prior order, the claims implicate a series of orders and appeals stemming from GM's bankruptcy proceedings. *Estate of Pilgrim*, 596 F. Supp. 3d at 816. A Sale Order, issued on July 10, 2009, demarcated what liabilities the post-bankruptcy "New GM" entity would and would not take on from the pre-bankruptcy "Old GM." *Id.*

The Order poses issues for Plaintiffs who purchased vehicles manufactured by "Old GM" but are suing "New GM." Under the Order, New GM is not liable to "persons and entities" for "claims based on any successor or transferee liability" and is not liable for other Old GM

---

[1] The Central District of California later entered summary judgment in favor of New GM on the remaining California claims after striking the plaintiffs' motion for class certification as untimely filed. *Pilgrim v. Gen. Motors Co.*, No. 15-08047, 2020 WL 7222098, at *6, *13 (C.D. Cal. Nov. 19, 2020), *aff'd sub nom. Estate of Pilgrim v. Gen. Motors LLC*, Nos. 20-56073 & 20-56290, 2021 WL 5917584 (9th Cir. Dec. 15, 2021).

liabilities unless New GM expressly assumed them in the bankruptcy proceedings. *See In re Motors Liquidation Co.*, 513 B.R. 467, 469 (Bankr. S.D.N.Y. 2014). Attempts to impose general liability on New GM based on Old GM's presale acts are "forbidden" by the Sale Order. *Id.* at 477. Additionally, New GM did not assume responsibility for "implied warranties and statements in materials such as individual customer communications, owner's manuals, advertisements, and other promotional materials" prepared by Old GM. *Id.* at 473. The sale closed on July 10, 2009, and Old GM was later dissolved. *See In re Motors Liquidation Co.*, 829 F.3d 135, 143, 147 (2d Cir. 2016).

On March 31, 2022, this Court issued an order granting in part and denying in part GM's motion to dismiss the operative complaint. ECF No. 29. The order dismissed twenty-two claims but allowed the remaining forty-one to proceed. Among other conclusions and rulings, the Court noted that—in light of the bankruptcy proceedings relating to the case—Plaintiffs had stipulated that any warranty and negligence claims could be brought only on behalf of Class Members who purchased or leased vehicles on or after July 10, 2009 (when "New GM" assumed liabilities for "Old GM"). *Id.* at PageID.1789. Accordingly, the Court allowed only "(1) warranty claims against New GM for vehicles manufactured by New GM, and (2) non-warranty claims based on New GM's conduct" to proceed. *Id.* at PageID.1789-90.

Since then, the parties have stipulated to the dismissal of certain plaintiffs (ECF No. 34), and Plaintiffs filed a Suggestion of Death filed regarding Plaintiff John LeBar (ECF No. 35). The proposed substitution for Plaintiff Lebar is addressed in a separate order. ECF No. 50.

On December 2, 2022, Plaintiffs filed the pending motion for class certification. ECF No. 38. The parties then stipulated to the dismissal of the claims of additional plaintiffs. ECF No. 41. Thirty-six Named Plaintiffs remain in the case. The Court held a hearing on the class-certification motion on June 28, 2023, during which it ordered Plaintiffs to submit as a supplemental exhibit the report of one of their experts, Robin T. Harrison. The Court has since received and reviewed a copy of that report. ECF No. 49-1.

## II.   LEGAL STANDARDS

Class certification is appropriate only when the moving party "affirmatively demonstrate[s] … compliance with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotations omitted). This is a two-step process. The party seeking class certification first must satisfy the four threshold showings under Rule 23(a) that:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

These "four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (internal quotations omitted).

Next, the moving party must show that its proposed class "satisf[ies] at least one of the three requirements listed in Rule 23(b)." *Id.* at 345. Plaintiffs seek certification only under Rule 23(b)(3), which requires a finding by the Court that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

The Supreme Court has emphasized that "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. Instead, the moving party "must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* (emphasis in original). So, before certifying any class, the Court must conduct a "rigorous analysis" into whether Rule 23 has been satisfied. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1078-79 (6th Cir. 1996). The analysis may "overlap with the merits of the plaintiff's underlying claim … because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp.*, 569 U.S. at 33-34 (internal quotations and citations omitted). It extends to expert testimony, which may not be

accepted uncritically as establishing a Rule 23 requirement. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307, 323 (3d Cir. 2008).

"Given the huge amount of judicial resources expended by class actions, particular care in their issuance is required." *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 630 (6th Cir. 2011). Nonetheless, the analysis and inquiry into the merits must be focused on and limited to "only those matters relevant to deciding if the prerequisites of Rule 23 are met;" the Court "may not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 851-52 (6th Cir. 2013) (internal quotations omitted).

### III.   PROPOSED CLASSES AND COMMON EVIDENCE

#### A. Class Structure

Plaintiffs' motion seeks certification of twenty-one separate classes on the claims that survived GM's motion to dismiss:

1. <u>Nationwide Class</u>: All current and former owners and lessees of a Class Vehicle on a claim for violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq.

2. <u>Alabama Class</u>: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease, Alabama residents, on claims of: (i) violation of the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1 et seq.; and (ii) fraud by concealment.

3. <u>Arizona Class</u>: All current and former owners and lessees who are, or were at the time of purchase or lease, Arizona residents, on claims of: (i) violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521 et seq.; and (ii) fraud by concealment.

4. <u>California Class</u>: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease, California residents, on claims of: (i) violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et seq.; and (ii) fraud by concealment.

5. <u>Florida Class</u>: All current and former owners or lessees of a Class Vehicle who are, or were at the time of purchase or lease, Florida residents, on a claim of violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et eq.

6. <u>Georgia Class</u>: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease, Georgia residents, on claims of: (i) violation of the Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-390 et seq.; and (ii) fraud by concealment.

7. <u>Illinois Class</u>: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease, Illinois residents, on a claim of violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. and 720 ICLS 295-1A.

8. <u>Indiana Class</u>: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease, Indiana residents, on claims of: (i) violation of the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-3; and (ii) fraud by concealment.

9. <u>Maryland Class</u>: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease, Maryland residents, on a claim for fraud by concealment.

10. <u>Massachusetts Class</u>: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease, Massachusetts residents, on claims of: (i) violation of Mass. Gen. Laws ch. 93A, § 1 et seq.; (ii) fraud by concealment; and (iii) breach of implied warranty of merchantability.

11. <u>Michigan Class</u>: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease,

Michigan residents, on claims of: (i) violation of the Michigan Consumer Protection Act, MCL § 445.903 et seq.; (ii) fraud by concealment or silent fraud; and (iii) breach of implied warranty of merchantability.

12.    Montana Class: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease, Montana residents, on claims of: (i) violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1973, Mont. Code Ann. § 30-14-101 et seq.; and (ii) fraud by concealment.

13.    Ohio Class: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease, Ohio residents, on claims of: (i) violation of the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01 et seq.; and (ii) fraud by concealment.

14.    Oklahoma Class: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease, Oklahoma residents, on claims of: (i) violation of the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15, § 751 et seq.; and (ii) fraud by concealment.

15.    Pennsylvania Class: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease, Pennsylvania residents, on a claim of violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. § 201-1 et seq.

16.    South Dakota Class: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease, South Dakota residents, on claims of: (i) violation of the South Dakota Deceptive Trade Practices & Consumer Protection Law, S.D. Codified Laws § 37-24-6, and (ii) fraud by concealment.

17.    Tennessee Class: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease, Tennessee residents, on claims of: (i) violation of the

Tennessee Consumer Protection Act of 1977, Tenn. Code Ann. § 47-18-101 et seq.; and (ii) fraud by concealment.

18.   Texas Class: All Texas residents that are current and former owners or lessees of a Class Vehicle who purchased a class vehicle in the State of Texas, on a claim of violation of the Texas Deceptive Trade Practices Consumer Protection Act, Tex. Bus. & Com. Code § 17.41 et seq.

19.   Utah Class: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease, Utah residents, on claims of: (i) violation of the Utah Consumer Sales Practices Act, Utah Code Ann. § 13-11-1 et seq., and (ii) fraud by concealment.

20.   Virginia Class: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease, Virginia residents, on claims of: (i) violation of the Virginia Consumer Protection Act of 1977, Va. Code Ann. § 59.1-196 et seq.; and (ii) fraud by concealment.

21.   Wisconsin Class: All current and former owners and lessees of a Class Vehicle who are, or were at the time of purchase or lease, Wisconsin residents, on a claim for violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 110.18.

Plaintiffs define "Class Vehicles" as "high performance Corvette Z06 or 427 and Camaro models with a 427 cubic inch LS7 engine manufactured and sold by General Motors Corporation (also known as Motors Liquidation Company) ('Old GM') and by defendant General Motors LLC ('defendant' or 'GM') during model years 2006 to 2013." ECF No. 38, PageID.2101.

As explained more fully below, Plaintiffs' definition of "Class Vehicles" is unwieldy because it implicates vehicles manufactured and sold by both Old GM and New GM. In its order on GM's motion to dismiss,

11

the Court made clear it was limiting any warranty and negligence claims to only vehicles manufactured by New GM (ECF No. 29, PageID.1789). The definition of "Class Vehicle" for this bucket of claims is therefore overbroad. And even for the other, non-warranty claims, the Court limited liability to conduct only by New GM. This poses problems for Plaintiffs, who must persuade the Court that they will be able to separate, on a class-wide basis, New GM's alleged actions and omissions from Old GM's alleged actions and omissions concerning the vehicles.

## B. Proffer of Evidence Common to the Class

### 1. *Existence of Defects*

In their motion, Plaintiffs assert that engines in the Class Vehicles suffer from both design and manufacturing defects. ECF No. 38, PageID.2125. Plaintiffs attribute the design defect chiefly to a poor choice of materials: the valve guides are made of sintered nickel/steel, which Plaintiffs say is disfavored in high-performance engines, while the intake valves are made of titanium (which Plaintiffs believe is too soft for use in this context without an adequate coating). *Id.* at PageID.2126. Plaintiffs additionally assert that the exhaust valve is defectively designed because its stem is too small for the sodium cooling system with which it operates. *Id.* As for the manufacturing defects, Plaintiffs say there are three: (1) incorrect machining of the inlet port; (2) non-concentricity of the valve guide and valve seat; and (3) improperly executed friction welding between the valve heads and valve stems. *Id.* at PageID.2126-27.

12

Plaintiffs' primary evidence of the defects comes from the testimony and opinions of two experts, Robin Harrison and Kohle Heimlich.

Harrison is a registered professional safety engineer and licensed attorney who runs an engineering consulting firm. Harrison Decl., ECF No. 38-3, PageID.2690. Plaintiffs retained him to review and analyze available documentary material related to the case. *Id.* at PageID.2691-92. To date, he has reviewed the discovery produced in this case, consulted technical works about the LS7 engine, read the complaint, and inspected an exemplar engine which suffered a catastrophic failure. *Id.*

Across a 17-page declaration and a 9-page report, Harrison opines that Class Vehicles generally suffer from the following defects: 1) incorrect machining of the inlet ports; 2) valve train design that allows erratic valve actuation; 3) defective design of the rocker arm assembly; 4) non-concentricity of the valve guides with the valve seats; 5) inferior and wrong materials for valve guides; 6) inferior and wrong materials for intake valves; 7) incorrect valve stem diameter; 8) weak or defective exhaust valve welds; and 9) defective design and use of hollow valve stems. *See* ECF No. 38-3, PageID.2693; *see also* ECF No. 49-1.

Harrison's bottom-line conclusion is that "the basic design of all LS7 engines was defective from both a manufacturing and design engineering perspective. GM failed to use modern technology to ensure reliable, safe operation under its expected use. These defects were common to all LS7 engines during the Class Period. In particular, the design of the valve

train, and particularly the exhaust valves and valve guides, is not adequate for the intended use … Manufacturing defects in the cylinder heads of these models have also contributed to the high rate of catastrophic failure of these engines." ECF No. 38-3, PageID.2705; *see also* ECF No. 49-1, PageID.4888.

According to Harrison, "GM has recognized the problem with the valve guide material, and has made at least one valve guide change," although he does not specify when this change was made. ECF No. 49-1, PageID.4885. Harrison does not appear to be certain how prevalent the manufacturing defects are. Based on his review of the discovery material, he says that "[a]t least some, and maybe all, of the Linamar[2] heads have at least 2 defects … at least 51 2007 model Corvettes have dropped a valve strongly point[ing] to a[n] … improperly manufactured exhaust valve." *Id.* at PageID.4884-85. Based on the high rate of exhaust valve failure he also speculates that the friction welding process to join the valve head to the valve stem was improperly carried out in some of the Class Vehicles. *Id.* at PageID.4885.

Heimlich, meanwhile, is the owner of American Heritage Performance, an engine rebuilding service in California. Heimlich Decl., ECF No. 38-4. In a five-page declaration, he says he has been contacted by numerous owners of Z06 Corvettes to rebuild engine cylinder heads.

---

[2] Linamar Corporation is a Canadian company in Guelph, Ontario, that manufactured the cylinder heads in the engines. ECF No. 38-3.

*Id.* at PageID.2708. He estimates that, over the years, his shop has reworked upwards of 3,700 LS7 cylinder heads a year. *Id.*

Based on his knowledge and experience, Heimlich estimates that approximately 75-85% of stock LS7 cylinder heads in Z06 and 427 model Corvettes have problems with valve guide wear. *Id.* He traces some of these issues to poor heat transfer in the engine, which causes oil to harden and thus prevents it from properly lubricating the valves and valve guides (possibly suggestive of a possible design defect). *Id.* at PageID.2708-09. According to Heimlich, he has been approached by clients with brand new engine heads, which he determined upon inspection to be out of spec straight from the factory (suggestive of manufacturing defects). *Id.* His bottom-line conclusions are that "the vast majority of the LS7 engines [he has] inspected exhibit clear signs of excessive valve guide wear" and that "it is dangerous to drive a Z06 Corvette with accelerated valve guide wear, as valve guide wear can and does lead to catastrophic failure." *Id.* at PageID.2710.

In addition to Harrison and Heimlich's opinions and testimony, Plaintiffs submit their responses to written interrogatories (ECF No. 38-2), declarations describing the circumstances of their purchases and the issues they experienced with their vehicles (ECF Nos. 38-5, 38-6, 38-7, 38-8, 38-9, 38-10, 38-12, 38-15, 38-16), excerpts of their deposition testimony (ECF Nos. 47-3 & 47-4), and an audit of GM's warranty claim data prepared by Karen Scott, a certified paralegal (ECF No. 38-11). The

declarations reflect purchases of used and new vehicles under a variety
of different circumstances and varying manifestations of defects. The
warranty claim audit reflects an average of a 3.18% claim rate between
2006 and 2013, with yearly percentages ranging from around 2% in 2012
to 5.41% in 2010. ECF No. 38-11, PageID.2757.

### 2.  *GM's Knowledge of the Defect*

Plaintiffs say that they have "common evidence demonstrating that
GM possessed material information regarding the defects in the LS7
engine and had a duty to disclose it, but failed to disclose it, to the
quantifiable detriment of all members of the state classes." ECF No. 38,
PageID.2156. To the declaration of their counsel (ECF No. 38-2), they
attach several categories of evidence. The Court highlights the following:

(1) Service bulletins from 2008, authorizing replacements of LS7
engines in 2007-2008 Z06 Corvettes and 2009 Corvettes.
PageID.2186-2192 (Exhibits 1 and 2).

(2) Repair/diagnostic instructions for 2012 Corvettes. PageID.2202-
05 (Exhibit 6).

(3) A declaration by David Marcarian, who is not a party to this
action, detailing a violent collision resulting from a catastrophic
engine failure in 2007. PageID.2194-95 (Exhibit 3).

(4) LS7 manufacturing specs. PageID.2197 (Exhibit 4);
PageID.2207 (Exhibit 7).

(5) What appear to be internal emails from 2015 discussing poor
machining in LS7 engine heads and the need for a quality audit.
PageID.2199-2200 (Exhibit 5).

(6) Emails describing GM's interactions in 2014-15 with Hib
Halverson, who went on to publish articles about LS7 engine

defects. Some emails speculate that if Halverson "has a solid understanding o[f] what we discussed and set the record straight it might deflate a class action. If a class action is filed it will be completely out of our hands." PageID.2217-23 (Exhibits 11-13). Others discuss Halverson's visits to GM. PageID.2265-70 (Exhibits 15-16).

(7) A partial excerpt of Halverson's article, presumably published sometime between 2014-15, discussing LS7 engine defects. PageID.2224-63 (Exhibit 14).

(8) GM's internal discussions about what to post about the defect in 2015 on the "Ask Tadge" forum page, where consumers can consult with "Tadge the Engineer." The ultimate post acknowledged problems with some LS7 engines manufactured between 2007-2009 and ascribed them to a manufacturing defect. It assured consumers that the manufacturer had since implemented quality controls. PageID.2272-78 (Exhibits 17-18).

(9) GM's internal correspondence from 2015 about the "wiggle test" and why it was discontinued, as well as correspondence about investigation and tear-down procedures. PageID.2281-82 (Exhibit 19), PageID.2285 (Exhibit 21).

(10) Internal correspondence from 2017, stating the engine problem was contained in 2011. PageID.2283 (Exhibit 20).

(11) Internal correspondence from 2015 about warranty data and investigations, saying there wasn't a significant issue other than a July 2008-March 2009 spike. PageID.2287-89 (Exhibit 22).

(12) Internal correspondence from 2013 discussing warranty claims. PageID.2291-93 (Exhibits 23-24). Additional correspondence from 2013 suggests that there were "two good years, 2011 and 2012," but that problems appeared to have returned in 2013. PageID.2295 (Exhibit 25).

(13) Internal correspondence from 2015 about implementing potential changes to the valve guide materials selected for use in the LS7 engines. PageID.2299-2305 (Exhibit 27).

Many of these materials appear to be excerpted; the authors of the emails and the dates on which they were sent are omitted. The internal correspondence appears to show differing levels of awareness by GM of some issues with some of the model years at issue here. Some correspondence reflects a belief that the issues were "fixed;" other emails discuss continuing warranty claims from certain model years.

## C. Damages Model

To support their argument that their damages are capable of class-wide measurement, Plaintiffs proffer the report of Edward Stockton, their damages expert. ECF No. 38-13. Stockton is an experienced expert witness in large-scale auto-defect litigation, whose opinions the Court has previously declined to exclude in a *Daubert* context. *See Chapman v. Gen. Motors LLC*, No. 19-12333, 2023 WL 2745161, at *7-*9 (E.D. Mich. Mar. 31, 2023); *Bledsoe v. FCA US LLC*, No. 16-14024, 2022 WL 4596156, at *29 (E.D. Mich. Sept. 30, 2022).

Plaintiffs retained Stockton to determine, assuming all the allegations in the complaint were proven true, "whether a feasible method exists to quantify any damages suffered on a Class-wide basis, and if so, to describe that method as [he] would apply it in the event that this matter proceeds to the merits stage." *Id.* at PageID.2851.

Stockton ultimately concludes that it is possible to calculate class-wide damages in this case through a bargain-based overpayment model. *Id.* at PageID.2857. He explains that such a model would assume that

18

class members were injured at the point of purchase because they unknowingly paid for a defective vehicle. *Id.* Stockton opines that these sorts of damages would "restore[] consumers to their negotiated positions had the Defect been disclosed at the time of purchase or lease" and account for "the ongoing link through use and ownership between characteristics of the vehicle actually delivered and the one for which consumers bargained." *Id.* at PageID.2867. The model would exclude damages from physical injury; it also would not quantify economic harms associated with unwitting assumption of post-sale risk or consequential economic costs of addressing the alleged defects. *Id.* at PageID.2860.

Stockton's report does not include any concrete calculations. He proposes to begin with Harrison's estimates of the average cost of a full repair and describes some adjustment he would make to this figure to bring the estimate in line with a "viable" economic model. *Id.* at PageID.2857. (As he acknowledges, some vehicles have had multiple owners, and some class members have received in-warranty repairs. *Id.* at PageID.2895.) Harrison, for his part, estimates that "the average C6 Z06 Corvette owner will spend about $4000 to rectify the defects." ECF No. 49-1, PageID.4888.

## IV.  DISCUSSION

GM raises a bevy of arguments opposing class certification, some with more merit than others. ECF No. 46. After carefully considering the arguments advanced on both sides, the Court agrees with GM that, for

19

many independent reasons, Plaintiffs have failed to carry their burden to establish that certification of any class is appropriate—both under Rule 23(a) and Rule 23(b)(3).

## A. Article III standing

The Court begins with GM's arguments about standing because standing is jurisdictional and therefore foundational. *See Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (quotations omitted)); *Morrison v. Bd. of Educ. of Boyd Cnty.*, 521 F.3d 602, 608 (6th Cir. 2008) ("By now, it is axiomatic that a litigant demonstrates Article III standing by tracing a concrete and particularized injury to the defendant—whether actual or imminent—and establishing that a favorable decision would provide redress.").

### 1. *Injury-in-Fact*

At the outset, GM argues that Plaintiffs' proposed classes impermissibly include uninjured class members. ECF No. 46, PageID.3014. According to GM, class members who have not experienced a catastrophic failure have suffered no actual or concrete injury. *Id.* at PageID.3015. GM urges that class members have an obligation to show that the defects they allege actually manifested in their vehicles. *Id.*

Courts in this district do not take such a narrow a view of Article III injury, however. *See, e.g., In re Duramax Diesel Litig.*, 298 F. Supp.

20

3d 1037, 1052-53 (E.D. Mich. 2018) (Ludington, J.); *Gamboa v. Ford Motor Co.*, 381 F.3d Supp. 3d 853, 886 (E.D. Mich. 2016) (Hood, J.); *see also Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006) (rejecting argument that manifestation of defect is required for class certification).

Plaintiffs assert that, even if they have not yet experienced a catastrophic failure, each class member has been injured by overpaying for their vehicles as a consequence of GM's failure to disclose the LS7 defects. "Monetary harm is a classic form of injury-in-fact." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005). This Court has previously concluded that similar assertions of overpayment injuries suffice to satisfy Article III's actual-injury requirement. *See, e.g.*, *Chapman v. Gen. Motors LLC*, No. 19-12333, 2023 WL 2746780, at *5 (E.D. Mich. Mar. 31, 2023). Here, it will do so again, as GM raises no argument this Court has not previously addressed.

### 2.   *Overbroad Warranty Classes.*

GM additionally contends that, given the Court's ruling on the motion to dismiss, anyone who purchased or leased a vehicle manufactured by Old GM lacks standing to assert implied warranty claims against New GM. ECF No. 46, PageID.3016. The argument applies principally to the proposed Massachusetts and Michigan warranty classes and the nationwide MMWA implied-warranty class.

The thrust of GM's argument is well-taken: individuals who purchased vehicles manufactured by Old GM cannot fairly trace their

injuries under warranty theories to New GM. And even for other causes of action, like the fraud and consumer protection claims, separating New GM's actions and omissions from Old GM's actions and omissions in the context of vehicles manufactured by old GM is a difficult enterprise. The Court believes, however, that this argument is better addressed in the context of the commonality and predominance inquiries under Civil Rule of Procedure 23 than in the context of standing under Article III. *See generally Ortiz v. Fibreboard Corp. Inc.*, 527 U.S. 815 (1999); *Amchem Prods., Inc v. Windsor*, 521 U.S. 591 (1997).

## B. Statute of Limitations

An obvious anomaly in this lawsuit is that it was filed in 2020, concerns vehicles from model years 2006-2013, which in some instances have passed through the hands of multiple owners, and—as evidenced in some of the declarations Plaintiffs have proffered in support of their motion—implicates purchases made as early as 2006 and as late as 2018. *See, e.g.*, Robert Briggs Interrogatories, ECF No. 38-2, PageID.2441 (purchase of 2007 vehicle in 2006); Michael Lanz Decl., ECF No. 38-9 (purchase of used 2013 vehicle in 2018). All Plaintiffs are asserting that they were injured at the point of sale.

The sprawling nature of the proposed classes raises questions whether they offend the limitations periods governing the mass of Plaintiffs' claims. As GM points out, the claims are subject to limitations periods ranging from one to six years. ECF No. 46, PageID.3012.

Limitations periods "are intended to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Gabelli v. S.E.C.*, 568 U.S. 442, 448 (2013) (internal quotations omitted). They are "vital to the welfare of society," as "even wrongdoers are entitled to assume that their sins may be forgotten." *Id.* at 449 (quotations omitted). The lawful right of a consumer who purchased a vehicle in say, 2006 or 2010, to file a lawsuit in 2020 over representations made to him at the point of sale is therefore limited.

Plaintiffs maintain that the filing of the initial suit in 2015 in the United States District Court in the Central District of California tolled the limitations period for all of their claims. ECF No. 47, PageID.4345.

In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 551 (1974), the Supreme Court held that the timely filing of a class action tolls the applicable limitations period for all persons encompassed by a class complaint. This so-called *American Pipe* tolling, which is equitable in nature, derives from the principal that "Rule 23 is not designed to afford class action representation only to those who are active participants in or even aware of the proceedings in the suit prior to the order the suit shall or shall not proceed as a class action." *Id.* at 552. The Court reasoned that "the commencement of the action satisfie[s] the purpose of the limitation provision" by notifying the defendants of the "number and generic identities of the potential plaintiffs" and the

23

"subject matter and size" of the suit. *Id.* at 551, 555. Without *American Pipe* tolling, the only way absent class members would be able to assure their participation in a judgment would be to file earlier motions to join or intervene as parties—which is exactly the kind of flurried mess of filings Rule 23 is supposed to avoid. *Id.* at 551.

GM acknowledges that all but four plaintiffs in this case were also plaintiffs in *Pilgrim I* and had their claims dismissed without prejudice for lack of personal jurisdiction. But it argues that, based on the Supreme Court's decision in *China Agritech, Inc. v Resh*, 138 S. Ct. 1800 (2018), Plaintiffs cannot avail themselves of *American Pipe* tolling to breath continuing life into a lawsuit filed in 2020. ECF No. 46, PageID.3014.

In *China Agritech, Inc.*, the Supreme Court held that upon denial of class certification, a putative class member may not—in lieu of promptly joining an existing suit or filing an individual action—commence a new class action beyond the time allowed by the applicable statute of limitations. 138 S. Ct. at 1804. As Plaintiffs point out, this holding is not exactly on point because the *Pilgrim I* claims were dismissed before that case progressed to the class-certification stage. And Plaintiffs re-filed their action in this district promptly after their claims were dismissed in *Pilgrim I*. GM has therefore been on notice of the claims in this case since it was originally filed in 2015.

But the Court's analysis does not end there. GM notes that several of the claims were untimely when they were first raised in 2015. ECF No.

46, PageID.3013. On this score *American Pipe* does not help Plaintiffs, since it applies *only* where the proposed class action was timely filed in the first place. For instance: the Alabama class includes a proposed class representative who purchased his vehicle in 2006 (William Goetzman, *see* ECF No. 38-2, PageID.2373); the Florida class includes a proposed class representative who purchased his vehicle in 2006 (Robert Briggs, *see id.* at PageID.2441); the Georgia class includes a proposed representative who purchased his vehicle in 2008 (Roger Browning, *see id.* at PageID.2462); the only proposed representative for the South Dakota class purchased his vehicle in 2008 (Derek Van Top, *see id.* at PageID.2586); the Texas class includes a proposed class representative who purchased his car in 2008 (John Le Bar, *see* ECF No. 15-1, PageID.639); the Virginia class includes a proposed class representative who purchased his vehicle in 2007 (William Church, *see id.* at PageID.640); and the only proposed representative for the Wisconsin class bought his car in 2009 (James Osheim, *see id.* at PageID.641).

Plaintiffs make no attempt to address this problem. And, as discussed below, because these different dates of purchase affect the limitations-period issue in different ways, these issues pose typicality problems under Rule 23(a) and predominance problems under Rule 23(b)(3). The motion for class certification must therefore be denied in part on this ground; *American Pipe* tolling can only save classes with claims that were timely raised by Named Plaintiffs from *Pilgrim I*.

### C. Class Certification Requirements under Rule 23(a)

GM next contends that Plaintiffs have failed to satisfy Rule 23(a)—which requires Plaintiffs to establish numerosity, commonality, typicality, and adequate representation. The Court agrees.

#### 1. Numerosity

Numerosity is shown when the number of plaintiffs is too large to make joinder practicable but not so large as to make administration impossible. *In re Am. Med. Sys., Inc.*, 75 F.3d at 1079.

Plaintiffs say that they can easily establish numerosity because—as they have learned from LS7 production data—over 30,546 vehicles were equipped with LS7 engines and GM has fielded at least 970 warranty claims regarding these engines. ECF No. 38, PageID.2133; *see also* Carr Decl., ECF No. 38-2, PageID.2172. They also point to attestations by their expert, Kohle Heimlich, who says that he has re-worked upwards of 3,200 LS7 cylinder heads and found evidence of valve guide wear in 75-85% of them. They urge that this is enough to propel them over the hurdle of demonstrating numerosity.

This may be so regarding the proposed nationwide class. There is no strict numerical test to determine whether the class is large enough or its members too numerous to be properly joined; the Sixth Circuit has previously held that a class of thirty-five was sufficient to meet the numerosity requirement. *Afro Am. Patrolmen's League v. Duck*, 503 F.2d 294, 298 (6th Cir. 1974).

But Plaintiffs also seek certification of 20 state-specific classes, and they do not offer anything—such as concrete purchase or warranty data—suggesting the number of individuals that could comprise each of these proposed classes. Ordinarily, numerosity is not a formidable obstacle for class certification, but here GM disputes that Plaintiffs have adequately established it. And on the record here, GM's arguments are fairly convincing. There is insufficient information in the record for the Court to begin to conceptualize how many, if any, potential class members could be included in, say, the Montana or South Dakota classes. The Sixth Circuit has instructed that, "while the exact number of class members need not be pleaded or proved, impracticability of joinder must be positively shown, and cannot be speculative." *Golden v. City of Columbus*, 404 F.3d 950, 965-66 (6th Cir. 2005) (quotations omitted).

Plaintiffs respond to GM's challenges with respect to numerosity by pointing to the declaration of their damages expert, Edward Stockton, who opines that "[a]t least three potential sources exist for determining the number of Class Vehicles." ECF No. 47, PageID.4349; *see also* Stockton Decl., ECF No. 38-13, PageID.2871. This misses the mark. It is Plaintiffs' burden at this stage to affirmatively demonstrate to the Court that they meet the numerosity requirement for each class. They cannot defer it to a later stage of this litigation.

The Court also notes that the manner in which the proposed class definitions are drawn poses ascertainability issues. Ascertainability is an

implicit requirement of class certification and concerns whether a class description is sufficiently definite so that it is administratively feasible for the Court to determine whether a particular individual is a member. *See Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016). "The existence of an ascertainable class of persons to be represented by the proposed class representative[s] is an implied prerequisite of Federal Rule of Civil Procedure 23." *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) (cited with approval in *Romberio v. UnumProvident Corp.*, 385 F. App'x 423, 431 (6th Cir. 2009)). As such, a class definition must be based on objective criteria that makes it possible to identify class members without individualized fact finding. *Id.*

The classes propose to include "[a]ll current and former owners or lessees of a Class Vehicle who are, and/or were at the time of their purchase," residents of a particular state. These definitions are unmanageable. The materials which Plaintiffs have submitted in support of their motion illustrate the extent of the problem. For instance, Plaintiffs propose the appointment of William Goetzman as a representative for the Alabama class; Bradley Grant for the Florida class; and Derek Van Den Top for the South Dakota class. These Plaintiffs reside in the states they wish to represent. But written discovery responses submitted in support of the class-certification motion show that Goetzman purchased his vehicle in Michigan; Grant purchased in Wisconsin; and Van Den Top in Idaho. As the class definitions are

presently drawn, it is less than clear whether Plaintiffs think they are members of one class or two.

### 2. Commonality

To be certified as a class action, the claims must include "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To demonstrate commonality, Plaintiffs "must show that there is a common question that will yield a common answer for the class (to be resolved later at the merits stage), and that the common answer relates to the actual theory of liability in the case." *Rikos v. Proctor & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015).

In their motion, Plaintiffs identify a number of common questions bearing on the resolution of their claims: (1) the existence of manufacturing and design defects in the LS7 engine; (2) GM's knowledge of these defects; (3) GM's failure to disclose the defects; and (4) the materiality of the omissions. ECF No. 38, PageID.2135. The Court concludes that these issues are sufficient to establish commonality.

GM does not appear to seriously contest the commonality of these issues but complains that "it is not enough to recite common questions; rather, there must be common answers provided by common class-wide proof." ECF No. 46, PageID.3019. But many of GM's arguments go to whether Plaintiffs have successfully established predominance under Rule 23(b), rather than commonality under Rule 23(a)(2). As will be discussed below, Rule 23(b)(3) functions as an important check against

the permissive requirements of Rule 23(a)(3). *See In re Am. Med. Sys., Inc.*, 75 F.3d at 1080. Although commonality and predominance are related, commonality does not require that *only* common questions exist. *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 105 (E.D. Mich. 2019) (Lawson, J.) ("Not all questions of law and fact raised in the complaint need be common … The standard is not [that] demanding." (quotations and citations omitted, alterations in original)).

### 3. Typicality

Typicality requires that a "sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000) (internal quotations omitted). Class members' claims must be "fairly encompassed by the named plaintiffs' claims." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (en banc) (internal citations omitted). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Id.* at 399.

Plaintiffs urge that their claims are typical of the class because they all purchased vehicles suffering from the same defect. ECF No. 38, PageID.2135. They further argue that their claims all arise from a common course of conduct by GM and that their legal theories apply with equal force to all members of the proposed classes. *Id.* at PageID.2136.

So far, so good. But a review of the allegations in the operative complaint and the material submitted in support of class certification reveals serious problems with Plaintiffs' assertions that their individual claims are typical of the class. Named Plaintiffs purchased their vehicles during different time periods (some as early as 2006 and some as late as 2018), so consequently they own vehicles manufactured by both Old GM and New GM. Moreover, they report unique purchasing experiences. For example: Derek Van Den Top from South Dakota bought his 2006 Corvette Z06 in 2008 from a private individual in Idaho, *see* ECF No. 38-2, PageID.2586; Russell Christiansen from Arizona bought a used 2008 Corvette Z06 in 2017 and does not know whether the dealership at which he made his purchase was GM-authorized, *see id.* at PageID.2419; Alan Pelletier from Massachusetts bought a new 60th Anniversary 427 Convertible Corvette automobile in 2013 from a GM-authorized dealership, *see id.* at PageID.2513.

In *Sprague*, the Sixth Circuit found that typicality was lacking because, in pursuing their own claims, the named plaintiffs could not advance the interests of the entire class. 133 F.3d at 399. The court explained:

> Each claim, after all, depended on each individual's particular interactions with GM—and these, as we have said, varied from person to person. A named plaintiff who proved his own claim would not necessarily have proved anybody else's claim.

*Id.*

31

Given the nature of the claims Plaintiffs assert—warranty claims, fraud claims, and consumer protection claims—their purchasing experiences subject them to a number of distinctive possible defenses and implicate several different issues. These include questions such as privity (can GM be held liable for omissions-based fraud if the consumer purchased a used vehicle from either a private individual or a non-GM authorized dealerships?); causation (can plaintiffs who purchased used vehicles defend against assertions of intervening causes of the defect?); timeliness (can plaintiffs whose purchases occurred as early as 2006 defend against challenges to the timeliness of their claims?); and extraterritorial application of state law (does South Dakota consumer protection law actually govern the claim of the proposed class representative who purchased his vehicle from a private entity in Idaho?). *See, e.g.*, *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 947 (6th Cir. 2011) ("Indeed, it is not even clear whether, under a proper interpretation of the Ohio Consumer Sales Practices Act, that law would apply to extraterritorial injuries."); *see also In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002) ("We do not for a second suppose that Indiana would apply Michigan law to an auto sale if Michigan permitted auto companies to conceal defects from customers; nor do we think it likely that Indiana would apply Korean law (no matter *what* Korean law on the subject may provide) to claims of deceit in the sale of Hyundai automobiles, in Indiana, to residents in Indiana.").

"Where a class definition encompasses many individuals who have no claim at all to the relief requested, or where there are defenses unique to the individual claims of the class members, the typicality premise is lacking, for—under those circumstances—it cannot be said that a class member who proves his own claim would necessarily prove the claims of other class members." *Romberio*, 385 F. App'x at 431. In this case, given the differences in the circumstances of their individual claims, Plaintiffs have failed to establish typicality.

### 4. *Adequacy of Representation*

Under Rule 23(a)(4), the Court must "measure the adequacy of the class members' representation based upon two factors: 1) the representatives must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013) (internal quotations omitted)). The adequacy requirement is essential to due process because a final judgment in a class action case is binding on all class members. *In re Am. Med. Sys., Inc.*, 75 F.3d at 1083.

GM mounts a number of challenges to the adequacy of the proposed class representatives, ranging from the fact that they are purchasers of vehicles manufactured by both Old GM and New GM and that they are all vehicle purchasers but wish to represent a class of both purchasers and lessees. ECF No. 46, PageID.3044-45. As discussed above, the

problems arising from the distinctive nature of the Named Plaintiffs' experiences prevent them from meeting the typicality requirement. The Sixth Circuit has explained that adequacy requirement "overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of other class members." *In re. Am. Med. Sys, Inc.*, 75 F.3d at 1083. So, in view of those same issues, the Court cannot find that the Named Plaintiffs are adequate class representatives.

### D. Class Certification Requirements under Rule 23(b)

Although the Court has concluded that Plaintiffs have failed to meet the threshold requirements of Rule 23(a), for the sake of completeness, it will address GM's remaining arguments. Ultimately, the Court concludes that Plaintiffs have also fallen short of meeting their burden under Rule 23(b)(3).

Rule 23(b)(3) requires findings that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The Rule lists the following factors as "pertinent" to these findings:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties of managing a class action.

Fed. R. Civ. P. 23(b)(3).

GM mounts four primary arguments: (1) individual variances in the substantive state law governing Plaintiffs' claims defeat a finding of predominance on the nationwide MMWA class; (2) plaintiffs have no evidence proving a common defect; (3) many of the state-law claims require individualized evidence; and (4) plaintiffs have failed to proffer a damages model satisfying *Comcast*.

### 1. Nationwide Class Problems

GM opposes certification of a nationwide MMWA class, asserting that variations between the warranty laws of the 50 states defeat a finding of predominance. ECF No. 46, PageID.3039-40.

Plaintiffs have not come close to satisfying their burden of convincing the Court that state-law variations will be no obstacle. They simply assert that "[c]ourts regularly certify classes in automobile defect cases involving legal and factual questions similar to those raised here." ECF No. 47, PageID.4349. This is insufficient, as it is Plaintiffs' burden to persuade *this* Court that the state-law variations in *this* case will not present predominance problems. *Pilgrim*, 660 F.3d at 948-49 (collecting cases illustrating the difficulty of proceeding on nationwide classes).

What's more, given the manner in which they have chosen to define the Class Vehicle, Plaintiffs' proposed nationwide MMWA class presently

includes class members who purchased vehicles manufactured and sold by both Old GM and New GM. Plaintiffs' stipulations during proceedings on GM's motion to dismiss, and the Sale Order from GM's bankruptcy, bars their efforts to proceed with so broadly defined a class.

The Court therefore declines to certify a nationwide class.

### 2. *Lack of Common Evidence of a Defect*

GM mounts two challenges to Plaintiffs' proffer of common evidence proving the existence of a uniform defect. ECF No. 46, PageID.3020.

First, GM argues that the testimony of the Plaintiffs themselves refutes the notion that there is a uniform defect affecting all classes of vehicles. To this end, it excerpts deposition testimony of Named Plaintiffs, noting that this testimony reflects differing experiences regarding when and to what extent they experienced any vehicle issues— some testified to experiencing catastrophic failures, for example, while others described only vaguely noticing some ticking sounds. It also notes that some Plaintiffs say they spent several thousands of dollars to replace their engines, while others admit they had no out-of-pocket costs at all. Because of these variations, GM says, Plaintiffs cannot establish that they all experienced the same defect.

GM concedes, however, that several Plaintiffs testified that they took their vehicles in for inspection and were told that their valves were "out of spec." At base, Plaintiffs assert that uniform defects affect all class vehicles and that, even if these defects have not yet manifested or

manifested in different ways, they were injured because they overpaid for their vehicles. The Court does not find this challenge persuasive.

Second, GM attacks the opinions of Plaintiffs' two experts, Harrison and Heimlich. GM asserts that, according to their deposition testimony, the two experts actually agree that it isn't possible to determine the root cause of an LS7 engine failure without actually inspecting each individual vehicle. ECF No.46, PageID.3021. According to GM, these admissions—when taken together with the report of their own expert, who has concluded that more than 99% of the class vehicles do not suffer from any valve guide issues, and the admissions of both experts during depositions there are any number of reasons an LS7 engine might fail— mean that it is impossible for Plaintiffs to demonstrate the existence of any uniform defects. *Id.* at PageID.3023.

The Court notes that the portions of the depositions GM cites as admissions are not accompanied by the full text of the expert's deposition.[3] Yet Plaintiffs could have pointed out relevant portions of the depositions that were not included if they wished to do so, but they did not. And the Court agrees with GM that Plaintiffs' evidentiary proffer of a common defect is less than overwhelming.

---

[3] In the context of summary-judgment motions, this Court's practice guidelines require parties to submit the full text of any source cited to be filed with the motion. While the current practice guidelines do not specifically require such submissions in support of motions for class certification, the better practice would have been to file the full text of the experts' depositions with the Court.

At the outset, the opinions of Plaintiffs' experts—as they have been presented to the Court—are severely underdeveloped. To be sure, the proper standard for how expert testimony should be evaluated during class certification is a question that divides courts. *Compare, e.g.*, *Ganci v. MBF Inspection Servs., Inc.*, 323 F.R.D. 249, 257 n.2 (S.D. Ohio 2017) (internal citations omitted) (reasoning that during class certification "courts can consider evidence that may be inadmissible at trial") *with In re Carpenter Co.*, No. 14-0302, 2014 WL 12809636, at *3 (6th Cir. Sept. 29, 2014) (suggesting that a *Daubert*-style "analysis may be required in some circumstances"). Given the Supreme Court's admonition that class certification requirements are *more than* mere pleading requirements, *see Wal-Mart Stores, Inc.*, 564 U.S. at 350, and admonitions by other circuit courts that expert testimony is not to be uncritically accepted, *see In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 305, 307, 323, the Court will briefly summarize its concerns.

At the outset, Harrison's summaries of his methodology and basis for his conclusions are inadequate. Regarding the design defect, for instance, he concludes that the sintered nickel/steel material selected for use in the valve guides and the titanium in the valves are poor materials for their intended use. ECF No. 49-1, PageID.4885. But his conclusions that "well-known bronze materials" would be better and that the valves need a hard coating are just that—conclusions. He does not explain whether industry standards, his own independent research, or something

else drives his conclusions. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) ("Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles or methods,' and whether the expert 'has applied the principles and methods reliably to the facts of this case.'")

With regard to the manufacturing defect, Harrison has come to the sweeping conclusion that "GM should have long since fired Linamar and gotten somebody who knows how to do it right." ECF No. 46-8, PageID.3151. The conclusion apparently derives from the fact that "51 2007 model Corvettes have dropped a valve," which to Harrison "strongly points to a weak, thus improperly manufactured, exhaust valve." ECF No. 49-1, PageID.4884. He does not discuss from what sample size this figure is drawn. He further raises concerns about Linamar's friction welding process. But his testimony fails to establish whether he believes that the defect is present in all the model years encompassed by Plaintiffs' broad definition of "Class Vehicle." Nor has Harrison conducted any sort of the failure rate analysis that typically accompanies large scale auto-defect litigation of this ilk. The absence of such an analysis poses problems for Plaintiffs, including issues with their ability to establish that their cars were "unmerchantable" as is generally required for an implied warranty claim.

Heimlich, meanwhile, does not come to any firm conclusions. He testifies only that he has done service on something north of 3,200 engine heads and observed that about 75-85% of those heads have valve-guide issues. ECF No. 46-9, PageID.3167. But he makes no conclusions about whether a uniform design or manufacturing defect is the source of these issues. Nor does he say which model years are most impacted.

At base, the fatal problem for Plaintiffs is that they are alleging the existence of multiple defects—both in design and in manufacture—which may or may not be uniformly present in all class vehicles. Regarding the alleged design defect, Harrison's declaration and report may support an inference that some LS7 engines were defectively designed because of a poor choice in materials, but the conclusions are ill-explained. As for the alleged manufacturing defects, the combination of Harrison's and Heimlich's opinions suggest that there may be some present in some model years—but also the defects may not uniformly affect all the model years encompassed in the class definition, or at least not in the same way.

At oral argument, Plaintiffs briefly suggested that—even if the defects affecting the vehicles are not uniform—at base the engines in the class vehicles likely have *some* sort of problem that has already or will in the future cause a need for extensive repairs. But this is insufficient; it is unclear whether the design defect can be repaired in the same manner as a manufacturing defect, rendering the answer to the question of whether damages can be calculated on a class-wide basis uncertain.

For this and other reasons, Plaintiffs have failed to persuade the Court that their claims are susceptible to common proof, and that individualized issues will not overwhelm the litigation.

### 3. *State-law specific issues*

GM next asserts that Plaintiffs cannot establish predominance because substantive state law requires evidence of individualized reliance for each of the claims Plaintiffs seek to certify. As to some of the claims, GM is correct. As to others, individualized reliance isn't required or can, under certain circumstances, be presumed—but there are other factors precluding class certification.

Plaintiffs make scant efforts to address the nuances of the substantive state law governing their claims; as to some of their claims, they merely quote portions of the relevant statutes and conclusorily assert that they "can litigate their claims on a classwide basis." *See* ECF No. 38, PageID.2142, 2145, 2146, 2147, 2150, 2154. In their reply brief, they argue that, as to their consumer protection and fraud claims, "[t]he issue of reliance does not defeat predominance because reliance can be presumed or inferred based on the materiality of the concealment and GM's common scheme in deceiving Plaintiffs and Class Members." ECF No. 47, PageID.4351. As summarized below, for many claims, this is incorrect; substantive state law does not permit such an inference.

Plaintiffs additionally cite the Ninth Circuit's decision in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998), for the proposition

that "[v]ariations in state law do not necessarily preclude a 23(b)(3) action." ECF No. 47, PageID.4351. As a general proposition, this holds true. But Plaintiffs cannot use this proposition to dodge their obligation to affirmatively demonstrate to the Court that, for each claim they seek to certify, individualized issues will not swamp the litigation. This is especially so where, as here, Plaintiffs are raising consumer protection claims—but not all have purchased vehicles directly from a GM-authorized entity, or even in the states whose laws they seek to invoke. Given the wide array of purchasing circumstances Plaintiffs experienced, they needed to assure the Court, among other things, that under the substantive law GM could actually be held liable.

A short summary of the issues with each bucket of claims follows.

**(a)   Consumer protection claims (19 claims in total)**

### *i.   Class Action Bars* **(5 claims)**

At the outset, as to five of Plaintiffs' consumer-protection claims, the state statutes governing those claims bar class actions outright:

- Alabama Deceptive Trade Practices Act [Count 3]: "A consumer or other person bringing an action under this chapter *may not bring an action on behalf of a class. The limitation in this subsection is a substantive limitation* and *allowing a consumer or other person to bring a class action or other representative action for a violation of this chapter would abridge, enlarge, or modify the substantive rights* created by this chapter." Ala. Code. § 8-19-10(f).

- Georgia Fair Business Practices Act [Count 14]: "Any person who suffers injury or damages … may bring an action individually,

*but not in a representative capacity*, against the person or persons engaged in such violations." Ga. Code Ann. § 10-1-399(a).

• <u>Montana Unfair Trade Practices and Consumer Protection Act of 1973</u> [Count 33]: "[A] consumer who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act, or practice declared unlawful … *may bring an individual but not a class action* …" Mont. Code Ann. § 30-14-133(1)(a).

• <u>Tennessee Consumer Protection Act</u> [Count 51]: "No class action lawsuit may be brought to recover damages for an unfair or deceptive act or practice declared to be unlawful under this part." Tenn. Code Ann. § 47-18-109(g).

• <u>Utah Consumer Sales Practices Act</u> [Count 56]: "A consumer who suffers loss as a result of violation of this chapter may recover, *but not in a class action*, actual damages or $2,000, whichever is greater, plus court costs." Utah Code Ann. § 13-11-19(2).

As to this issue, Plaintiffs offer no response.

The Court acknowledges that there is some dispute whether these limitations are procedural or substantive. Some federal courts have concluded, in resolving motions to dismiss, that these statutory bars are merely procedural limitations that do not inhibit federal class litigation. *See, e.g.*, *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1337 (11th Cir. 2015); *see also Phillips v. Hobby Lobby Stores, Inc.*, No. 18-01645, 2019 WL 8229168, at *5 (N.D. Ala. Sept. 30, 2019) (concluding, even after Alabama legislature amended statute to state that statutory class action bar was not mere procedural bar, that *Lisk* remains good law). But they do not all agree. *See, e.g.*, *Lessin v. Ford Motor Co.*, No 19-01082, 2020 WL 6544705, at *13 (S.D. Cal. Nov. 6, 2020) (within context

43

of GFBPA claim, "declin[ing] to follow Plaintiffs' cited case law regarding the inapposite consumer protection law" and collecting cases from other districts concluding that statutory bar on class actions is substantive).

This disagreement is the result of differing interpretations of the scope of the Supreme Court's deeply fractured opinion in *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010). In *Shady Grove*, the Supreme Court reviewed the dismissal of a proposed class action based on a New York Civil Rule of Procedure[4] prohibiting

---

[4] The full text of the rule in effect at the time provided:

> (a) One or more members of a class may sue or be sued as representative parties on behalf of all if:
>
> > 1. the class is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;
> > 2. there are questions of law or fact common to the class which predominate over any questions affecting only individual members;
> > 3. the claims or defenses of the representative parties are typical of the claims or defenses of the class;
> > 4. the representative parties will fairly and adequately protect the interests of the class; and
> > 5. a class action is superior to other available methods for the fair and efficient adjudication of the controversy.
>
> (b) Unless a statute creating or imposing a penalty, or a minimum measure of recovery specifically authorizes the recovery thereof in a class action, an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action.

N.Y Civ. Prac. Law Ann. § 901 (West 2006).

cases from proceeding as class actions if they sought to recover penalties or statutory minimum damages. *Shady Grove*, 559 U.S. at 397. The Court was tasked with determining whether New York's rule barred a federal court sitting in diversity from entertaining a class action under Federal Rule of Civil Procedure 23. Ultimately, a plurality said "no:" the class action bar in the New York rules conflicted with Federal Rule of Civil Procedure 23, and the New York rule was merely procedural. *Id.* at 399.

Many courts consider Justice Stevens's concurring opinion in *Shady Grove* to be the controlling one. *See, e.g., Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 798 (E.D. Mich. 2019) (Roberts, J.) (collecting cases). Justice Stevens concluded that "[a] federal rule … cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term *but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right.*" *Shady Grove*, 559 U.S. at 423 (Stevens, J., concurring) (emphasis added).

The statutory bars at issue here are qualitatively different than the New York rule in *Shady Grove*, which was expressly styled as a rule of civil procedure. Indeed, the bars exist in the statutes themselves. Most of the consumer protection statutes listed above envision enforcement primarily by the state Attorney General, who is typically empowered to pursue only injunctive relief and penalties. The private causes of action, meanwhile, grant remedies to individual plaintiffs for *actual* damages—

and in some instance treble penalties. Courts in this district have previously dismissed putative class claims because of such statutory bars, reasoning that the class-action prohibition is a substantive limitation and not merely a procedural one. *See Cunningham v. Ford Motor Co.*, 641 F. Supp. 3d 400, 416 (E.D. Mich. 2022) (Leitman, J.); *Matanky*, 370 F. Supp. 3d at 798. The Court considers these interpretations well-reasoned: the statutes listed above create substantive rights. They do not establish mere rules of procedure.

Accordingly, these claims may not be certified.

### ii.   *Individualized reliance required* (6 of 19 claims)

The following claims require evidence of individualized reliance or causation, and do not permit an inference of either on a class-wide basis, which precludes class certification:

- Arizona Consumer Fraud Act [Count 5]: Ariz. Rev. Stat. § 44-1522 impliedly creates a private cause of action. *Sellinger v. Freeway Mobile Home Sales, Inc.*, 521 P.2d 1119, 1122 (Ariz. 1974). The Arizona Court of Appeals repeatedly explained that reliance is a necessary element of such a claim. *See Correa v. Pecos Valley Dev. Corp.*, 617 P.2d 767, 771 (Ariz. Ct. App. 1980) ("Injury occurs when the consumer relies on the misrepresentation, even though reliance need not be reasonable."); *see also Sanders v. Harris*, No. 1 CA-CV 19-0835, 2021 WL 282261, at *4 (Ariz. Ct. App. Jan. 28, 2021) ("To succeed on their consumer fraud claims, [plaintiffs] needed to prove [defendants] made a misrepresentation or omitted a material fact in connection with the sale or advertisement … and they suffered damages *as a result of reliance* on the misrepresentation or omission of a material fact … In the case of an omission, they needed to show [defendants] intended they rely on the omission." (emphasis added)); *cf. People ex rel. Babbitt v. Green Acres Tr.*, 618

P.2d 1086, 1094 (Ariz. Ct. App. 1980) ("[R]eliance or actual deception or damage is not a prerequisite to a consumer fraud action brought by the attorney general."), *superseded by statute on other grounds,* 1981 Ariz. Sess. Laws, ch. 295, § 5.

• Pennsylvania Unfair Trade Practices & Consumer Protection Law [Count 45]: The Pennsylvania Supreme Court has held the private cause of action requires proof that a plaintiff was actually deceived or influenced. *Weinberg v. Sun Co., Inc.*, 777 A.2d 442, 446 (Pa. 2001) ("There is no authority which would permit a private plaintiff to pursue an advertiser because an advertisement might deceive members of the audience and might influence a purchasing decision when the plaintiff himself was neither deceived nor influenced … Nothing in the legislative history suggests that the legislature ever intended the statutory language directed against consumer fraud to do away with the traditional common law elements of reliance and causation."). The Pennsylvania Superior Court has repeatedly held that these sorts of claims are improper for class treatment. *See, e.g., Debbs v. Chrysler Corp.*, 810 A.2d 137, 155-56 (Pa. Super. Ct. 2002).

• South Dakota Deceptive Trade Practices & Consumer Protection Law [Count 48]: The Supreme Court of South Dakota explained in *Nygaard v. Sioux Valley Hospitals & Health Sys.*, 731 N.W.2d 184, 197 (S.D. 2007), that there are certain subsections of the South Dakota Consumer Protection Law that do not require proof that a person "has in fact been mislead, deceived, or damaged" as a result of an unlawful practice. The private cause of action is not one of them.

• Texas Deceptive Trade Practices Act [Count 53]: This Court has previously declined to certify a claim under TDTPA, observing that while the Texas Supreme Court has not completely foreclosed class treatment of these claims, it has severely limited whether one can go forward. *Chapman*, 2023 WL 2746780, at *18 (citing *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 693-94 (Tex. 2002)). As the Texas Court of Appeals has explained, reliance "can be shown only by demonstrating the person's thought processes in reaching the decision." *Fidelity & Guar. Life Ins. Co. v. Pina*, 165 S.W.3d 416, 423 (Tex. App. 2005) (internal quotations omitted).

- <u>Virginia Consumer Protection Act</u> [Count 59]: Virginia courts have consistently held that reliance is required to establish a VCPA claim. *See, e.g.*, *Shirland Arms Corp. v. Hall Const., Inc.*, No. L04-2331, 2005 WL 1125656, at *1 (Va. Cir. Ct. May 12, 2005) (VCPA claims, like common law fraud claims, require reliance); *Reed v. Litton Loan Servicing LP*, No. LR-2617-1, 2004 WL 1386314, at *2 (Va. Cir. Ct. May 26, 2004) (same); *Weiss v. Cassidy Devel. Corp.*, 2003 WL 22519650, at *2 (Va. Cir. Ct. Aug. 18, 2003) ("Allegations of misrepresentation of fact must include the elements of fraud: a false representation, of a material fact, made intentionally and knowingly, with intent to mislead, *reliance by the party misled*, and resulting damage." (emphasis added)).

- <u>Wisconsin Deceptive Trade Practices Act</u> [Count 62]: To establish WDTPA claim, a plaintiff must show: "(1) the defendant made a representation to the public with the intent to induce an obligation, (2) that the representation was untrue, deceptive or misleading, and (3) that the representation *caused* the plaintiff a pecuniary loss." *Novell v. Migliaccio*, 749 N.W.2d 544, 522 (Wis. 2008) (quotations omitted, emphasis added). The WDTPA does not recognize fraudulent omission as actionable. *Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 245 (Wis. 2004) ("Silence—an omission to speak—is insufficient to support a claim under Wis. Stat. § 100.18(1). The DTPA does not … impose a duty to disclose, but rather, prohibits only affirmative assertions, representations, or statements of fact that are false, deceptive, or misleading.").

### iii.   *Remaining claims* (8 of 19)

The remaining consumer law statutes are less demanding, such that individualized evidence of reliance or causation is not *necessarily* required for a successful claim:

- <u>California Consumer Legal Remedies Act</u> [Count 7]: A CLRA claim requires a showing "not only that a defendant's conduct was deceptive but that the deceptive cause [the plaintiffs] harm." *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (Cal. Ct. App. 2009) (internal quotations omitted). California courts have held that

causation may be established on a class-wide basis by a showing of materiality. *Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 156-57 (Cal. Ct. App. 2010). Materiality of an alleged misrepresentation is assessed through a "reasonable man" standard. *Id.* That a defendant can show a lack of causation as to a handful of members does not necessarily make causation an individual issue.

- <u>Florida Unfair & Deceptive Trade Practices Act</u> [Count 12]: A FDUPTA claim has three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *City First. Mortg. Corp. v. Barton*, 988 So.2d 82, 86 (Fla. Dist. Ct. App. 2008) (internal quotations omitted); *see also Carriulo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016). It is governed by a "reasonable consumer" standard, obviating the need for proof of individual reliance by class members. *Office of the Attorney Gen. v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla. Dist. Ct. App. 2004).

- <u>Illinois Consumer Fraud & Deceptive Business Practices Act</u> [Count 17]: An ICFA claim requires: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *De Bouse v. Bayer*, 922 N.E.2d 309, 313 (Ill. 2009). Whether a misrepresentation is "material" is determined through a reasonable person standard. *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 595 (Ill. 1996); *see also Cozzi Iron v. Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 576 (7th Cir. 2001) (noting that "the Illinois Supreme Court has repeatedly held that … reliance is not required to establish a consumer fraud claim" and collecting cases").

- <u>Indiana Deceptive Consumer Sales Act</u> [Count 19]: The Indiana Deceptive Consumer Sales Act provides a private cause of action to persons "relying upon an uncured or incurable deceptive act." Ind. Code 24-5-0.5-4(a). Unlike the consumer protection acts in Alabama and Georgia discussed above, it expressly provides that "[a]ny person who is entitled to bring an action under subsection (a) on the person's own behalf against a supplier for damages for a deceptive act may bring a class action against such supplier on

49

behalf of any class persons of which that person is a member and which has been damaged by such deceptive act."

- <u>Mass. Gen. Law ch. 93A, § 1</u> [Count 27]: Chapter 93A generally prohibits "[u]nfair methods of competition and unfair and deceptive acts or practices in the conduct of any trade or commerce." MGLA 93A § 2(a). Section 9 expressly allows "[a]ny person entitled to bring [an] action … [to] bring the action on behalf of himself and such other similarly injured and situated persons." As the Supreme Judicial Court of Massachusetts explained, "General Laws c. 93A (consumer protection statute) entitles plaintiffs to relief where traditional legal remedies were considered inadequate by the Legislature. Unlike a traditional common law action for fraud, consumers suing under c. 93A need not prove actual reliance on a false representation, or that the defendant knew that the representation was false." *Dalis v. Buyer Advertising, Inc.*, 636 N.E.2d 212, 216 (Mass. 1994).

- <u>Michigan Consumer Protection Act</u> [Count 30]: The Michigan Supreme Court has held that "members of a class proceeding under the [MCPA] need not individually prove reliance on the alleged misrepresentations. It is sufficient if the class can establish that a reasonable person would have relied on the representations." *Dix v. Am. Bankers Life Assur. Co. of Fla.*, 415 N.W.2d 206, 206 (Mich. 1987).

- <u>Ohio Consumer Sales Practices Act</u> [Count 39]: The Ohio Consumer Sales Practices Act expressly contemplates class actions by consumers. Ohio Rev. Ann. § 1345.09(E). "[I]t is sufficient that the conduct complained of has the likelihood of inducing in the mind of the consumer a belief which is not in accord with the facts." *Funk v. Montgomery AMC/Jeep/Renault*, 586 N.E.2d 1113, 1119 (Ohio Ct. App. 1990); *see also Tsirikos-Karapanos v. Ford Motor Co.*, 99 N.E.3d 1203, 1215 (Ohio Ct. App. 2017) ("[W]hether an act is deceptive or unfair depends on how the consumer viewed the supplier's act or statement. Therefore, if the supplier does or says something, regardless of intent, which has the likelihood of inducing in the mind of the consumer a belief which is not in accord with the facts, the act or statement is deceptive." (internal quotations omitted)).

50

- <u>Oklahoma Consumer Protection Act</u> [Count 42]: The four elements of a private cause of action under the Oklahoma Consumer Protection Act are: "(1) that the defendant engaged in an unlawful practice …; (2) that the challenged practice occurred in the course of defendant's business; (3) that the plaintiff, as a consumer, suffered an injury in fact; and (4) that the challenged practice caused the plaintiff's injury." *Patterson v. Beall*, 19 P.3d 839, 846 (Okla. 2000). The Act neither expressly provides for nor bars class actions, but Oklahoma courts have previously certified claims under the Act. *See, e.g.*, *Ripp v. Okla. Comm'ns Sys., Inc.*, 525 P.3d 52 (Okla. Civ. App. 2022).

But Plaintiffs' lack of workable class definitions and their failure to persuade the Court that they will be able to adduce common evidence of uniform defects preclude certification. Moreover, some of these statutes have additional limitations not reflected by the class definitions; some are limited in application to new goods purchased for household use, and some limit the applicability of consumer protection statute to auto sales. *See, e.g.*, *Cyr v. Ford Motor Co.*, No. 345751, 2019 WL 7206100, at *1 (Mich. Ct. App. 2019). None of these claims can be certified.

### (b) Fraudulent concealment claims

Plaintiffs also seek to certify fraudulent concealment claims under the laws of fourteen states: Alabama [Count 4], Arizona [Count 6], Georgia [Count 16], Indiana [Count 20], Maryland [Count 25], Massachusetts [Count 28], Michigan [Count 31], Montana [Count 34], Ohio [Count 40], Oklahoma [Count 43], South Dakota [Count 49], Tennessee [Count 52], Texas [Count 54], and Virginia [Count 60].

At the outset, many federal courts have observed that fraud claims often are not suitable for class treatment based on the varying degrees of the materiality of the fraud and the reliance on it by the proposed class members. *See, e.g.*, *Clark v. Prudential Ins. Co. of Am.*, 289 F.R.D. 144, 186-87 (D.N.J. 2013); *see also Hurd v. Monsanto*, 164 F.R.D. 234, 240 n.3 (S.D. Ind. 1995) ("Plaintiffs' fraud claims against both defendants are similarly inappropriate for class treatment. One necessary element in a fraud claim is reliance. Each class member will thus have to prove what acts or omissions of the defendants he actually relied upon and how that reliance caused his injury."); *Perta v. Comprehensive Accounting Corp.*, No. 84-5484, 1985 WL 1900, at *3 (N.D. Ill. July 3, 1985) ("[T]he necessity of proving reliance by each class member upon the alleged fraudulent misrepresentations causes individual issues to predominate.").

Of course, there are exceptions to the rule. But Plaintiffs do not engage at all with the nuances of the multiple regimes of state common-law they invoke. Instead, they conclusorily assert that, "because they require no individual inquiries into particular consumers' reliance or decision-making processes," the claims can be certified. ECF No. 38, PageID.2156. Their support for this sweeping conclusion lies buried in a footnote which contains a string of unexplained citations. *Id.* at PageID.2155 n.8.

The Court has reviewed the cases cited in this footnote and is not persuaded that they are germane to the issue. And from its independent

research of the state law governing these claims, it is not persuaded that reliance can be presumed so broadly in each instance.[5] The Court also has additional concerns, which Plaintiffs have not even begun to address. Do these state common-law claims require privity? How can Plaintiffs show, with common proof on a class-wide basis, that *New* GM

---

[5] *See, e.g., Univ. Fed. Credit Union v. Grayson*, 878 So.2d 280, 287 (Ala. 2003) (observing that "fraud actions are not often well suited for class-action certification" because they "involve numerous misrepresentations and varying kinds of degrees of reliance, all of which create individualized issues"); *Schock v. Jacka*, 460 P.2d 185, 188 (Ariz. 1969) ("The gist of an action based on fraud is fraud in defendant and damage to plaintiff; and its basic elements are false representations by defendant and reliance thereon by plaintiff to his damage."); *GCA Strategic Inv. Fund v. Joseph Charles & Ass., Inc.*, 537 S.E.2d 677, 681-82 (Ga. Ct. App. 2000) (observing that "[t]he essential elements to an action in tort for damages resulting from a material misrepresentation constituting fraud are: (1) that the defendant made the representations; (2) that at the time he knew they were false …; (3) that he made them with the intention and purpose of deceiving the plaintiff; (3) that the plaintiff [justifiably] relied on such representations; [and] (5) that the plaintiff sustained the alleged loss and damage as the proximate result of their having been made"); *Wells v. Stone City Bank*, 691 N.E.2d 1246, 1250 (Ind. Ct. App. 1998) (holding that a party generally must prove five elements: 1) that there was a material misrepresentation of past or existing fact; 2) that the representation was false; 3) that the representation was made with knowledge or reckless ignorance of its falsity; 4) that the complaining party relied on the representation; and 5) that the representation proximately caused the complaining party's injury); *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 234 (Md. App. 2000) ("Success in Maryland on a civil claim of fraud requires proof of reliance".); *Hord v. Envtl. Research Inst. of Mich.*, 617 N.W.2d 543, 550 (Mich. 2000) ("A legal duty to make a disclosure will arise most commonly in a situation where inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information.").

fraudulently concealed information from class members who purchased used vehicles, manufactured by *Old* GM, from *private* entities? Can this proof be the same as for class members who purchased New GM vehicles from GM-authorized dealerships? Plaintiffs' lack of engagement with the substantive state law precludes certification. It was their burden affirmatively demonstrate that common issues susceptible to class-wide proof will predominate.

### 4. Damages Model

GM also attacks Plaintiffs' damages model as inconsistent with their theory of liability. Under *Comcast Corp v. Behrend*, 569 U.S. 27, 35 (2013), Plaintiffs must present a damages model adequately tethered to their theory of liability to satisfy Rule 23. "Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case." *Id.* (internal quotations and citations omitted).

Plaintiffs *now* say they are seeking only overpayment damages and that they will be able to present an overpayment model. But their only evidence of a model comes from a declaration by their expert, Edward Stockton. Though Stockton says what he will produce at some point in the future is an "overpayment" model, he appears to be calculating *repair* costs. Stockton acknowledges that some class members may have received repairs, that some class members may no longer own their vehicles, and that the usefulness of a vehicle diminishes over time. In lieu

of actually demonstrating how he would incorporate variables, however, he asserts only conclusorily that he will be able to factor them in at some point in the future. He does not acknowledge in his declaration the considerable issues posed by GM's bankruptcy and the split in liabilities.

The Court is not persuaded that, at this stage, this showing is enough or that Stockton's descriptions of the model he intends to create are sufficient. As explained above, Plaintiffs' ability to demonstrate damages is considerably hampered by several different factors.

## E. Superiority

Although the Court has already identified numerous barriers to the certification of class, it will briefly address superiority. Factors relevant to this inquiry include "the class members' interests in individually controlling the prosecution or defense of separate actions" and "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

The Court finds that class action treatment is neither superior nor manageable in this case. While the likely need for expert testimony to establish the existence of the defects alleged may inhibit certain putative class members from pursuing individual actions, the tidal wave of individual issues will swamp the litigation. The proposed classes—which include new and used vehicles manufactured over the course of seven years by two different entities, purchased under a variety of different circumstances during a nearly two-decade-long period—are sprawling, unwieldy, and raise a variety of unique defenses to GM.

Additionally, the fact that Plaintiffs also wish to pursue claims under the laws of twenty different states which they have demonstrated no familiarity with makes class treatment of the case unmanageable. The Sixth Circuit has recognized that, in multi-state class actions, variations in state law may overwhelm common issues and impose upon this Court the "impossible task of instructing a jury on the relevant law." *Pilgrim v. Univ. Health Card, LLC*, 660 F.3d 943, 948 (6th Cir. 2011) (internal quotations omitted).

## V.   CONCLUSION

Plaintiffs have failed to carry their burden to establish that certification of any of the proposed classes is appropriate. Accordingly, for the reasons set forth above, **IT IS ORDERED** that Plaintiff's motion for class certification is **DENIED**.

**IT IS FURTHER ORDERED** that, within 30 days of this Opinion & Order, counsel shall meet and confer about how to proceed with the individual claims asserted in this action by the Named Plaintiffs. An order setting a status conference to discuss scheduling shall follow.

**IT IS SO ORDERED**, this 30th day of September, 2023.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

56